# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LISA K. KREINBRINK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Case No. 08 C 5764 |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiff Lisa Kreinbrink seeks to overturn review the Commissioner of Social Security's decision to deny her application for Social Security Disability Insurance benefits. Kreinbrink has moved for summary judgment, seeking a judgment awarding her benefits or a remand for further consideration, and in response, the Commissioner seeks a judgment upholding the denial of benefits. For the reasons stated below, the Court denies Kreinbrink's motion and affirms the denial of benefits.

## Background

Kreinbrink is a forty-five year old woman with a general equivalency diploma (GED) and some college course credit. She has not worked in any capacity since November 2006. From 2003 until November 2006, Kreinbrink was employed as a case manager at Sheridan Correctional Center. Before taking the position as case manager, Kreinbrink worked for five years as the manager of two liquor stores.

On April 2, 2007, Kreinbrink applied for disability insurance benefits, claiming that she became disabled on November 9, 2006. She alleged disability due to anxiety, depression, migraine headaches, fibromyalgia, rheumatoid arthritis, and mitral valve prolapse. The Social Security Administration (SSA) denied her application initially and on reconsideration. Following these denials, Kreinbrink requested a hearing before an Administrative Law Judge (ALJ). Kreinbrink, who was represented by counsel, testified at the hearing. Vocational expert Ronald Malik also testified at the SSA's request. In May 2008, the ALJ determined that Kreinbrink was not disabled denied her claim for benefits. The SSA's Appeals Council declined review, and as a result, the ALJ's decision became the Commissioner's final decision.

**1.     Summary of medical evidence**

Records from Dr. Khawaja, Kreinbrink's treating cardiologist, show Kreinbrink has a history of mitral valve prolapse (MVP), a heart disorder. In 2005, Kreinbrink began complaining of stress at work and was prescribed Alprazolam (Xanax) for her symptoms. In March 2006, she reported shortness of breath and stress and requested two work release notes from Dr. Khawaja, which he provided. A stress echocardiogram in April 2006 revealed no abnormalities other than minor MVP.

Kreinbrink went to a hospital emergency room on November 9, 2006, complaining of chest pain. Emergency room physicians told her she was suffering from anxiety. When she visited Dr. Khawaja the following day, Kreinbrink's condition had improved, and she denied any other episodes or any shortness of breath. That day, Dr. Khawaja wrote a letter stating that Kreinbrink should be excused from work for an indefinite period of time due to "stress-related symptoms." There is no record of any

further treatment by Dr. Khawaja.

In April 2007, Kreinbrink visited Dr. Daniel Gauthier, an osteopathic physician, because of lower back pain. Kreinbrink denied any chest pain or palpitations. Dr. Gauthier's examination revealed tenderness and muscle tightness along Kreinbrink's thoracic spine and intrascapular region, which Dr. Gauthier assessed as back strain. The rest of the examination was normal, though Dr. Gauthier noted that Kreinbrink seemed "very anxious." Dr. Gauthier recommended stretching and a physical therapy evaluation; he also prescribed Flexeril (a muscle relaxant), Ultracet (a pain reliever), and Zoloft (a depression and anxiety medication). In May 2007, Kreinbrink requested that Dr. Gauthier change the Zoloft to Effexor.

On June 1, 2007, Kreinbrink underwent a consultative psychological examination with Dr. Mark B. Langgut, a licensed clinical psychologist, as part of her disability benefits determination. Although Dr. Langgut described Kreinbrink's speech as "somewhat pressured and emotionally highly variable," he also described her speech as "clear, direct, relevant, and characterized by a normal rate of production."

Dr. Langgut's report provides historical information about Kreinbrink. Both of Kreinbrink's parents were deaf, and her siblings have a history of suicide attempts and bipolar disorder. Kreinbrink was sexually molested by her uncle as a child and beaten by her mother throughout her childhood. From 1989 to 2002, Kreinbrink was married to an alcoholic man who was physically and emotionally abusive. Kreinbrink has good relationships with her four children. Her oldest daughter has been diagnosed with bipolar disorder, and there is also a history of bipolar disorder on Kreinbrink's mother's side of the family. At the time of the examination, Kreinbrink was not undergoing any

3

mental health therapy. Though she had been in therapy in the past, Kreinbrink stated she discontinued the therapy because it had no positive effect.

Dr. Langgut also noted that Kreinbrink reported that her sleep was impaired. She reported sleeping approximately sixteen hours per day in the weeks prior to her examination. However, Dr. Langgut described Kreinbrink as "able to complete her activities of daily living," including cleaning, laundry, shopping and cooking. Kreinbrink engaged in various hobbies and had a good social support network. Dr. Langgut described Kreinbrink's demeanor as "friendly and outgoing."

With respect to her mental and psychological state, Kreinbrink reported feeling depressed and stated that depression was her predominant emotion at certain times. Kreinbrink also reported anxiety and panic attacks. Dr. Langgut stated that it was unclear whether the panic attacks were related to mitral valve prolapse or emotional symptoms. She also expressed anger toward the family members who had abused her and said she experienced flashbacks of the physical abuse she endured. However, Dr. Langgut described Kreinbrink's short-term and long-term memory as normal. She displayed adequate abstract reasoning skills and her judgment was intact. He described Kreinbrink's thought processes as characterized by normal to rapid speed, average coherence, and normal flexibility and suggestibility. Her consciousness was clear and her orientation to time, location, place, and person was unimpaired. He described Kreinbrink as demonstrating adequate judgment, responsibility and reasoning skills. Dr. Langgut diagnosed Kreinbrink with post-traumatic stress disorder and stated in his notes, "R/O [rule out] bipolar disorder."

On June 2, 2007, Dr. Afiz Taiwo, an internal and occupational medicine

specialist, administered an internal medicine consultative examination at the request of the SSA.  Dr. Taiwo noted that Kreinbrink said she tired after walking three blocks and standing for fifteen minutes but reported no difficulty sitting, bathing, dressing and cooking.  A physical examination revealed no irregularities.  Dr. Taiwo reported good grip strength in both hands, a normal ability to grasp and manipulate objects, and normal range of motion in all joints and the spine.  Dr. Taiwo described Kreinbrink as "appropriate, polite, pleasant and cooperative," with a normal affect and no signs of depression, agitation, irritability or anxiety.  He identified her major problems as depression, anxiety, and a history of MVP.

On June 20, 2007, a state agency physician, Dr. Nenaber, reviewed Kreinbrink's medical records and determined that she had some exertional limitations but was capable of performing medium work.  On June 25, 2007, a state agency psychologist, Dr. Leslie Fayans, reviewed Kreinbrink's medical records.  Dr. Fayans opined that Kreinbrink suffered from anxiety and post-traumatic stress syndrome but was limited in only two of the twenty vocational areas related to mental functioning on the job.

Kreinbrink had several follow-up visits with Dr. Gauthier in 2007.  In August 2007, Kreinbrink scheduled an appointment to discuss her medications and anxiety.  Dr. Gauthier's medical records indicate that Kreinbrink reported no back pain, joint pain, joint swelling, stiffness or arthritis at this visit.  Dr. Gauthier again noted that Kreinbrink was "very anxious," and he recommended psychotherapy, which Kreinbrink refused.  Dr. Gauthier also recommended daily exercise and other lifestyle changes.  Kreinbrink visited Dr. Gauthier on October 31, 2007 to discuss the medication she was taking at the time, Effexor.  Dr. Gauthier noted that Kreinbrink was walking sixty minutes each

5

day and that her anxiety disorder had improved.  However, Kreinbrink requested a change in her medication due to weight gain.  Kreinbrink returned to Dr. Gauthier's office on November 30, 2007 later with anxiety as her chief complaint.  Dr. Gauthier again advised Kreinbrink to change her eating patterns and begin exercising regularly; he also recommended light weight training.

In November 2007, Kreinbrink went to the emergency room complaining of pain in her foot after a vacuum cleaner fell on her foot.  An x-ray revealed no fracture.  Six days later, Kreinbrink visited Dr. Shane York, a podiatrist, for the same foot pain.  Dr. York diagnosed a deep contusion on the foot.  Kreinbrink was given a Cam walker boot to wear until her foot healed.

On November 27, 2007, Dr. Shirin Ahmad began treating Kreinbrink at the Midwest Orthopaedic Institute due to her complaints of increasing joint pain.  Kreinbrink's symptoms suggested fibromyalgia, and Dr. Ahmad prescribed Medrol for pain relief.  In December 2007, an MRI examination of Kreinbrink's right hand revealed small joint effusions on the first, second, third, fourth, and fifth metacarpal joints and small areas of bone marrow edema in, it appears, two digits.  Dr. Ahmad diagnosed Kreinbrink with seronegative rheumatoid arthritis and possible fibromyalgia.  On January 3, 2008, Dr. Ahmad amended his diagnosis and noted that Kreinbrink's symptoms were more likely due to fibromyalgia than arthritis.  Dr. Ahmad encouraged Kreinbrink to continue taking her medication and to begin a low-grade aerobic program.

In December 2007, Dr. Gauthier noted multiple cervical, thoracic, and lumbar trigger points (hyperirritable spots).  He also recorded Dr. Ahmad's recent diagnoses of fibromyalgia and seronegative arthritis.  Kreinbrink returned to Dr. Gauthier twice in

January. On January 8, 2008, Dr. Gauthier noted that Kreinbrink had a foot fracture that was being treated by a podiatrist. Dr. Gauthier also noted that Kreinbrink's fibromyalgia and anxiety symptoms had improved. On January 31, 2008, Kreinbrink was not wearing the walking cast the podiatrist had given her for her foot. Dr. Gauthier adjusted the dosage of Kreinbrink's current medication, Cymbalta. He again recommended psychotherapy; Kreinbrink declined.

On January 8, 2008, Kreinbrink visited Dr. York and complained of continued pain in her right foot. Despite Dr. York's orders, Kreinbrink had stopped wearing the Cam walker boot. An MRI revealed that she had a fracture on the third metatarsal of her right foot. Dr. York again advised Kreinbrink to use the Cam walker. At a January 22, 2008 visit, Dr. York noted that Kreinbrink was again non-complaint with respect to the Cam walker.

In February 2008, Kreinbrink visited Dr. Ahmad's office, reporting that her fibromyalgia symptoms had not significantly improved. Kreinbrink stated, however, that she had discontinued Plaquenil, a medication that Dr. Ahmad had prescribed at a previous visit, because of its side effects. Dr. Ahmad again noted that her current joint pain symptoms were more consistent with fibromyalgia than arthritis and suggested that Kreinbrink continue taking Cymbalta and follow up with a psychologist for biofeedback therapy.

In March 2008, Kreinbrink returned to Dr. York complaining of continued foot pain. Dr. York noted Kreinbrink's continued non-complaince with respect to use of the Cam walker boot and recommended Kreinbrink be placed in a below-the-knee cast. Kreinbrink also visited Dr. Gauthier in March 2008, as a follow up on her fibromyalgia,

7

anxiety and foot pain. Kreinbrink reported morning hand stiffness, diffuse generalized aches (though she experienced less pain after taking Cymbalta), anxiety and poor sleep. Dr. Gauthier recommended that Kreinbrink address her anxiety and psychiatric issues before committing to narcotic pain medication. Kreinbrink declined this suggestion.

On April 25, 2008, Dr. Gauthier submitted a letter at the request of Kreinbrink in which he opined that Kreinbrink was disabled on the basis of her fibromyalgia, posttraumatic stress disorder, and generalized anxiety disorder with depression. He expected the period of disability to last for approximately six months.

**2.     Hearing testimony**

Kreinbrink and vocational expert Ron Malik testified at the hearing before the ALJ in April 2008. In her testimony, Kreinbrink described her daily activities and the symptoms that she said prevented her from working. Kreinbrink lives with her two sons, aged sixteen and fourteen. Because of her symptoms, Kreinbrink stated that her sons do most of the housework. She is unable to participate in any hobbies or outdoor activities. Kreinbrink stated that she smokes approximately one pack of cigarettes per day and consumes as many as a dozen cans of caffeinated soda per day. At the time of the hearing, Kreinbrink was taking several medications: Cymbalta, Xanax, Ibuprofen, blood-pressure medication, Ambien, and Flexeril.

Kreinbrink identified her hands as her most serious impediment to working because, she said, they start cramping after two to three minutes of use. She also described pain in her hips, legs, and shoulders, which she believed was the result of fibromyalgia. She stated she could not stand for more than five minutes, could walk two

blocks at a time, could sit for fifteen to twenty minutes at a time, and lifting a gallon of milk was difficult. She testified that she slept approximately three hours each night. Kreinbrink also reported suffering from migraine headaches that occurred three to four times per month and typically lasted three days at a time. Though Kreinbrink has a driver's license, she stated that she rarely drives because she is afraid of getting a migraine headache while driving. She stated that she experiences four to five panic attacks each month, in which she experiences light-headedness, numbness and difficulty breathing. Kreinbrink also discussed her mitral valve prolapse, the symptoms of which, she said, increased when she was under stress, and she reported a loss of concentration. She stated that her symptoms had been getting progressively worse since she had stopped working in November 2006.

Ron Malik testified as a vocational expert. Malik characterized Kreinbrink's previous work as a clerk in the prison as semi-skilled and light, her work as a case manager as semi-skilled and sedentary, and her work as a liquor store manager as skilled and light. The ALJ asked Malik whether a hypothetical person with Kreinbrink's age, educational and work experience could do light work with the following limitations: no ladders, ropes or scaffolding use; only occasional use of stairs, ramps, stooping or crawling; frequent balancing, crouching or kneeling; only occasional fine manipulations with the hands; and no concentrated exposure to unprotected heights or excessive noise. Given these limitations, Malik stated that such an individual would be able to return to the liquor store manager position and the case manager position. Malik also stated that such a person would be able to obtain other skilled and semi-skilled light and sedentary jobs, such as a case aid in social services, security system monitor, an

9

information clerk, or a record clerk. When questioned by Kreinbrink's counsel, Malik stated that six to eight unexcused absences per month would eliminate all unskilled positions and a limitation of no fine manipulation would eliminate all potential positions.

## Discussion

A claimant must suffer from a disability to be eligible for disability insurance benefits. "Disability" is defined in the Social Security Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period or not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Regulations under the Social Security Act prescribe a five-step process by which to determine if a person is disabled. 20 C.F.R. § 404.1520(a). In this process, the following questions are addressed in order:

(1)  Does the claimant currently have substantial, gainful employment?

(2)  Is the claimant's impairment severe?

(3)  Does the claimant's impairment(s) meet or equal one of the specific impairments listed in the regulations appendix?

(4)  Is the claimant unable to perform his or her former occupation?

(5)  Is the claimant unable to perform any other work in the national economy?

20 C.F.R. § 404.1520(b)-(f). An affirmative answer leads to the next step or, on steps three and five, to a determination that the claimant is disabled. A negative answer at any step other than step three leads to a finding that the claimant is not disabled. Before completing step four, the ALJ must adjust the claimant's residual functional capacity (RFC) to accommodate any work-related limitations the claimant has. The

10

RFC is then used to determine at steps four and five whether the claimant may work in her previous occupations or other positions.

**1.     The ALJ's decision**

Following the hearing, the ALJ used the five-step process and determined that Kreinbrink is not disabled because she is able to perform past relevant work as a liquor store manager or case manager. Alternatively, the ALJ found that Kreinbrink has job skills that are transferable to other occupations with jobs existing in significant numbers in the national economy. In reaching her decision, the ALJ made eleven numbered determinations. most of which she supported, where appropriate, with further discussion:

(1)     Kreinbrink meets the insured status requirement of the Social Security Act.

(2)     Kreinbrink has not been engaged in gainful activity since November 9, 2006.

(3)     Kreinbrink has two severe impairments: mitral valve prolapse and fibromyalgia.

(4)     Kreinbrink does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

(5)     Kreinbrink has the residual functional capacity to perform light work with certain exceptions: no ladders, ropes or scaffolds; only occasional climbing of stairs to; only occasional stooping and crawling; limited balancing, crouching or kneeling; only occasional fine manipulations with the hands; and no concentrated exposure to unprotected heights or excessive noise.

(6)     Kreinbrink is able to perform past relevant work as a liquor store manager

or case manager.

(7) Kreinbrink was considered a younger individual on the alleged disability date.

(8) Kreinbrink has a high school education.

(9) Kreinbrink has acquired work skills from past relevant jobs.

(10) Kreinbrink has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy.

(11) Kreinbrink has not been under a disability from November 9, 2006, to the date of this decision.

In her appeal to this Court, Kreinbrink challenges determinations three, four, five, six, ten, and eleven. Her arguments, however, focus on errors at finding three and in the calculation of Kreinbrink's residual functional capacity in finding five. Kreinbrink argues that the ALJ made three errors. First, the ALJ failed to give proper deference to the opinion of Kreinbrink's treating physician, Dr. Gauthier. Second, the ALJ's assessments of the severity of Kreinbrink's mental and physical impairments are not supported by substantial evidence. Third, the ALJ improperly discounted Kreinbrink's subjective complaints of pain.

## 2. Standard of review

The Court will uphold the Commissioner's decision if it is supported by substantial evidence and is free of legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*

12

v. Perales, 402 U.S. 389, 401 (1971); Kepple v. Massanari, 268 F.3d 513, 516 (7th Cir. 2001). The ALJ must "build a logical bridge from the evidence to his conclusion," Steele, 290 F.3d at 941, and "must confront the evidence that does not support his conclusion and explain why it was rejected." Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004). Although the Court reviews the entire record to determine if there is relevant evidence to support the ALJ's conclusion, it does not decide the facts anew, reweigh evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000); Kepple, 268 F.3d at 516. The Court must, however, conduct a critical review of the evidence and may not simply rubber-stamp the decisions of the Commissioner. Ehrhart v. Sec'y of Health and Human Serv., 969 F.2d 534, 538 (7th Cir. 1992); Clifford, 227 F.3d at 869.

3. **Deference to treating physician**

Kreinbrink first argues that the ALJ should have given deference to Dr. Gauthier's opinion that she is disabled as a result of her fibromyalgia, posttraumatic stress disorder, and anxiety with depression. A claimant is not entitled to disability benefits simply because a physician finds she is "disabled" or "unable to work." See 20 C.F.R. § 404.1527(e); Clifford, 227 F.3d at 870. An ALJ must, however, give a treating physician's opinion regarding the nature and severity of an impairment controlling weight if it is supported by medically acceptable diagnostic techniques and is not inconsistent with the other substantial evidence in the case. See 20 C.F.R. § 404.1527(d)(2); Shramek v. Apfel, 226 F.3d 809, 814 (7th Cir. 2000). If, on the other hand, the treating physician's opinion is inconsistent with the other substantial evidence, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ

13

may discount it, as long as she articulates her reasons for doing so. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *See Schmidt v. Astrue*, 496 F.3d 833, (7th Cir. 2007); *Elder v. Astrue*, 529 F.3d 408, 416 (7th Cir. 2008).

Substantial evidence supports the ALJ's decision not to give controlling weight to Dr. Gauthier regarding Kreinbrink's physical impairments. As the ALJ explained in her opinion, the record contains little objective evidence in support of the alleged severity of Kreinbrink's physical symptoms. Dr. Gauthier opined that Kreinbrink is disabled due to fibromyalgia and arthritis. However, Dr. Gauthier is not a rheumatologist or the doctor primarily treating Kreinbrink's fibromyalgia symptoms, making it reasonable for the ALJ not to give his opinion controlling weight. *See* 20 C.F.R. § 404.1527(d)(3) ("we generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist"); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist.").

In addition, other evidence in the record contradicts Dr. Gauthier's characterization of Kreinbrink's fibromyalgia as disabling. All of the tests conducted by Kreinbrink's rheumatologist were normal, with the exception of the December 2007 MRI, which revealed only small joint effusions on the bones in Kreinbrink's right hand. A physical exam by Dr. Taiwo revealed normal grip strength and normal range of motion. The conflicting reports provide a reasonable basis for the ALJ's decision to give little weight to Dr. Gauthier's opinion of Kreinbrink's fibromyalgia as disabling. Indeed, the ALJ weighed all of the available evidence regarding Kreinbrink's fibromyalgia and arthritis and adjusted Kreinbrink's RFC by limiting the amount of fine manipulation

14

allowed.

With respect to Kreinbrink's mental impairments, Dr. Gauthier's opinion that Kreinbrink is disabled due to her posttraumatic stress disorder, anxiety, and depression was particularly lacking. Dr. Gauthier is not a mental health expert. His opinion is inconsistent with the reports of Drs. Langgut and Fayans, both of whom are licensed clinical psychologists. Based on a consultative exam, Dr. Langgut found that Kreinbrink's memory, concentration, fund of information, abstract reasoning and judgment were adequate. Dr. Fayans reviewed Kreinbrink's full medical record and determined that Kreinbrink's anxiety disorder created only a minor limitation in two of the twenty areas related to mental functioning on the job.

Faced with the inconsistency between Dr. Gauthier's opinion and other medical records, the ALJ weighed the evidence and chose not to give Dr. Gauthier's opinion controlling weight. This Court may not substitute its judgment for that of the ALJ if the ALJ's findings are supported by substantial evidence. The reports of Drs. Langgut and Fayans provide substantial evidence for the ALJ's rejection of Dr. Gauthier's opinion regarding the effect of Kreinbrink's mental impairments on her ability to work.

4.  **Severity of mental and physical impairments**

Kreinbrink takes issue with the ALJ's assessment of her mental impairments as causing only a minimal limitation in her ability to perform basic work activities. Kreinbrink argues that the ALJ misinterpreted Dr. Langgut's psychological examination report and failed to consider her PTSD, anxiety, and depression symptoms in the RFC calculation. This Court's review of the ALJ's findings on the severity of a claimant's impairments does not depend on whether the Court agrees with the ALJ's decision.

15

Rather, the Court considers whether the ALJ's determinations are supported by substantial evidence, such that a reasonable person could arrive at the ALJ's determination. *Steele*, 290 F.3d at 940.

The ALJ's interpretation of Dr. Langgut's report was reasonable. Kreinbrink argues that the ALJ's characterization of her status as "essentially normal" is unsustainable by pointing to passages from the report in which Dr. Langgut noted the symptoms that Kreinbrink described. This confuses Kreinbrink's subjective report of her symptoms with Dr. Langgut's findings. Dr. Langgut's report outlined a variety of depression and anxiety symptoms reported by Kreinbrink. Dr. Langgut then stated, however, that Kreinbrink "has learned adequate coping skills and Xanax [anxiety medication] helps significantly." Dr. Langgut observed no behavioral abnormalities and found Kreinbrink's memory, fund of information, computational skills, abstract reasoning skills, and judgment normal. He described Kreinbrink's orientation to time, location, place and person as normal. Dr. Langgut's report is consistent with the report of Dr. Taiwo, who found no signs of depression, agitation, irritability or anxiety during his exam.

The ALJ used the evidence from Dr. Langgut's report to build a logical bridge to the conclusion that Kreinbrink's mental impairments do not significantly impede her work ability. The ALJ confronted the evidence that did not support her conclusion and explained her determination that Kreinbrink's mental impairments create only a minimal limitation. To do so, the ALJ analyzed each of the four broad functional areas set out in the disability regulations for evaluating mental disorders and cited medical evidence and testimony to show Kreinbrink has minimal or no limitation in each area. The ALJ

16

specifically referred to Dr. Langgut's report and to the mental RFC assessment. The ALJ further stated that based upon the evidence, Kreinbrink had full orientation, intact memory and judgment and adequate concentration, attention, and reasoning skills; she was able to relate well to others; and she participated in a variety of daily activities. The ALJ's determination that Kreinbrink's mental impairments minimally affected her ability to work and not to include any adjustments to Kreinbrink's RFC due to mental impairments are supported by substantial evidence and are sufficiently explained.

Kreinbrink also takes issue with the ALJ's assessment of her physical impairments – specifically fibromyalgia – for the purposes of determining her RFC. The ALJ acknowledged Kreinbrink's history of fibromyalgia but found that the evidence of record "[revealed] minimal objective findings and improvement in symptoms with medications." A review of the record as a whole supports the ALJ's determination. Neither Dr. Gauthier nor Dr. Ahmad identified any exertional restrictions due to Kreinbrink's fibromyalgia symptoms. In fact, the doctors recommended that Kreinbrink exercise by pursuing a low-grade aerobics program and lifting weights. Additionally, both doctors note improvement in Kreinbrink's symptoms with medications such as Cymbalta. The record does reflect some evidence of possible arthritis in Kreinbrink's right hand, appearing in a December 2007 MRI. The ALJ acknowledged and accommodated these symptoms in the RFC assessment by including a limitation that Kreinbrink could perform only occasional fine manipulations.

Kreinbrink asserts that the ALJ had a misunderstanding of fibromyalgia, citing *Sarchet*, in which the Seventh Circuit reversed a district court's decision to uphold the denial of disability benefits from a claimant with fibromyalgia. In *Sarchet*, the Seventh

Circuit found that the ALJ failed to build a logical bridge between the evidence and the result because the ALJ misunderstood the symptoms, treatment, and medical terminology of fibromyalgia. *Sarchet*, 78 F.3d at 307-08. Kreinbrink does not point out any such errors in the ALJ's decision in this case. The ALJ's decision indicates that she understood the symptoms of fibromyalgia but determined that Kreinbrink's symptoms were not severe enough to prevent her from working. Determinations regarding the severity of symptoms are the province of the fact-finder, and this Court may not substitute its judgment for that of the ALJ, so long as the ALJ's judgment was based on substantial evidence. *Clifford*, 227 F.3d at 869. The record provides substantial evidence for the ALJ's determination of Kreinbrink's mental and physical impairments.

5.   **Credibility assessment of Kreinbrink**

Finally, Kreinbrink challenges the ALJ's determination that her testimony about the intensity, persistence, and limiting effects of her symptoms was not fully credible. When a claimant's statements are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record. Because the ALJ is in the best position to see and hear witnesses, this Court must give deference to her credibility determinations. *See Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003); *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007). The Court may reverse an ALJ's credibility determination only if the claimant can show it is patently wrong. *Id.*

According to Kreinbrink, the ALJ's determination is flawed because she did not say that Kreinbrink exaggerated or was inconsistent. However, the absence of such language does not reflect that the ALJ's findings are unsupported by substantial

evidence. As described earlier, there is minimal objective medical evidence to substantiate Kreinbrink's allegations regarding the severity and intensity of her pain (the December 2007 MRI showing minimal joint effusions on Kreinbrink's right hand is the sole exception). As a result, the ALJ had to make her credibility determination based on the entirety of the record.

The record provides adequate support for the ALJ's credibility finding. The ALJ stated that she had considered all of Kreinbrink's symptoms, the objective medical evidence, and other evidence based on the requirements of 20 C.F.R. § 404.1529 and SSRs 96-4p and 96-7p. The ALJ then gave specific reasons for discounting some of Kreinbrink's testimony: an echocardiogram that revealed only mild MVP; improvement in her fibromyalgia symptoms with medications; Dr. Langgut's essentially normal mental status examination; the lack of evidence of impairment from her migraine headaches; Dr. Taiwo's report indicating no mental status abnormalities and a normal physical examination; and the fact that none of Kreinbrink's many treating physicians imposed any specific work-related restrictions. This evidence provided a reasonable basis on which to reject certain of Kreinbrink's statements as incredible. Because the ALJ did not find Kreinbrink's testimony fully incredible, she adjusted Kreinbrink's RFC to acknowledge the limitations that were supported by the record. Kreinbrink fails to show that the ALJ's decision is patently wrong.

## Conclusion

The ALJ's decision is supported by substantial evidence and is free of legal error. For the reasons above, the Court denies Kreinbrink's motion for summary judgment [docket no. 20] and affirms the decision below. The Clerk is directed to enter judgment

upholding the decision of the Social Security Administration.

                                             _____
                                             MATTHEW F. KENNELLY
                                             United States District Judge

Date: September 14, 2009